**IN THE MATTER OF THE ARBITRATION ACT 1996**
**AND**
**IN THE MATTER OF AN ARBITRATION**
**B E T W E E N:-**

### GLOBAL TRANSPORTE OCEANICO S.A.

**(Claimant)**

#### -and-

### CLIPPER SHIPPING LINES LTD

**(Defendant)**

_____

### FIRST WITNESS STATEMENT OF REBECCA KING

_____

I, Rebecca King, of Marlow House, Lloyd's Avenue, London EC3N 3AL will say as follows:

1.    I am a solicitor of the Supreme Court and an assistant in the firm of Holman, Fenwick & Willan of the above address. I have the care and conduct of this matter on behalf of the Claimant ("Global"), along with Jean Koh under the supervision of James Gosling, partner, of Holman, Fenwick & Willan, and I am authorised to make this statement on its behalf.

2.    There is now shown to me marked "RK1" a paginated bundle of copy documents to which I shall refer in the course of this statement. Except where otherwise indicated, the matters set out in this statement are derived from the documents exhibited thereto, and/or from exchanges I have had with representatives of Global (principally Marianne Lachmann and Jose Carlos Ramos).

3.    Global and the Defendant ("Clipper") are parties to a joint venture agreement dated 25th January 2001 (p.1), pursuant to which Global and Clipper agreed to run a liner service between the East Coast of South America and West Africa ("the

1

JVA"). A number of disputes between the parties have arisen in relation to the operation of the JVA. These are considered in detail below.

4.   I make this statement in support of Global's application for immediate interim relief in this matter. The Tribunal will be aware that on 5th September 2006, Clipper have themselves indicated that they intended to apply for interim relief (p.112), and that Global indicated in response that they would make cross-applications for interim relief (p.115). No order was made for the exchange of evidence in relation to Clipper and Global's application, but Global envisaged a time-table for the exchange of evidence which would result in both applications being heard in or about the week commencing 25 September 2006 at the earliest. In fact, at the time of writing, Clipper have still not served their application for interim relief.

5.   During the course of last week, Global have had an opportunity to consider in more detail the manner in which the joint venture accounts are being operated by Clipper. In doing so, it has become apparent that Global are in need of more immediate interim relief in order to protect their position, pending the hearing of both parties' remaining interim applications (which have not yet been issued, and, contrary to Global's original expectations, any applications are now unlikely to be heard until the week commencing 2nd October 2006 at the earliest). In essence, the immediate relief sought now by Global aims to ensure that the *status quo* is maintained (at least until the parties' remaining interim applications are heard).

## I.    Background

6.   Pursuant to the JVA (p.1), Clipper agreed to handle the daily operation of the service, including the operation and chartering in of vessels (clause 1-2), as well as providing two of its own vessels to the service (clause 2(A)), and operating tonnage provided by Nigeria America Line Ltd ("NAL") who Global contend are owned by Clipper (which Clipper disputes) (clause 2(F)). Clipper also agreed to

2

control the funding and cashflow of the service (clause 2(C)). On my understanding, Global's role was to obtain cargoes and freight for the joint venture[1], due to its strong presence in the Brazilian market (which Clipper disputes) and to control the container tracking system.

7.    Profits from the operation of the JVA were to be shared on a 50/50 basis. Expenses incurred by each of the joint venture ("the JV") partners were to be debited to the joint venture at actual cost. These expenses included "*cargo claims and legal disputes of all kinds related to the service*", and overheads (including office expenses) incurred by both parties (clause 4). The JV also provided that "*the partners agree that the service should always maintain the overhead expenses at the lowest possible level, cost/benefit being the determining factor*" (clause 4).

8.    The JVA also provided that although the tonnage was operated by Clipper, Global had the right to issue their own bills of lading for up to 50% of the cargo carried eastbound (clause 5).

9.    The JVA provided for an executive board to handle the business of the joint venture (clause 7). It was expressly agreed that the joint venture would obtain pre-approval in writing from both parties in order to (1) "*approve of any major decisions affecting the service*", and/or (2) "*establish or alter commercial and freight policy*", and/or (3) "*to charter any vessels on long term basis on behalf of the service*" (clause 7).

10.   The JVA also provided that the agreement was for an indeterminate period of time, subject to the right to terminate on 180 days written notice (clause 12). In case the agreement was terminated, then the parties agreed that they would together deal with (by sale, positioning, disposition etc) the equipment being used by the service, which would include containers leased by the JV (clause 11(C)).

---

[1] Outside of Sao Paolo.

In addition, the parties agreed to build up an accrual of about US$750,000 to 1 million to be used against wind-down expenses (to be reviewed on an annual basis and adjusted as agreed by the partners (clause 11(D)).

11.    Having regard to the nature of the JVA, Global contends that it operated as a partnership between the parties. This is denied by Clipper. As a result, Global contend that the parties were subject to additional obligations to account for any benefits, additional fiduciary obligations and obligations of good faith (see further paragraph 6.4 and 6.5 of Amended Request for Arbitration). In addition, and as is the case in any agreement, the parties were under implied obligations to co-operate with each other.

12.    On 10th January 2006, Clipper gave notice of termination under clause 12 of the JV. Accordingly, the JVA came to an end (subject to winding down) on 10th July 2006. Clipper continues to manage the JV accounts in the winding down phase and many further disputes have arisen since termination in relation to the winding down of the joint venture.

## II.    Global's immediate application for interim relief

13.    Global's immediate application arises out of Clipper's winding down of the joint venture account. The Tribunal is invited to consider the following documents:

1. a spreadsheet which lists payments made recently from the joint venture account (p.145-154) ("the Payments Summary").

2. a spreadsheet sent to Global by Clipper in May 2006, which lists payments which Clipper indicated that they intended to pay out from the joint venture account between 1st May 2006 and the end of 2006 (p.44-53) ("the May Estimate of Wind Down expenses").

3. a spreadsheet sent to Global by Clipper on 23rd August 2006, which lists payments which Clipper indicated that they intended to pay out from the

4

joint venture account between 14th August 2006 and the end of 2006 (p.99-111) ("the August Estimate of Wind Down expenses").

4. a spreadsheet attached to Clipper's Answer, which again lists payments which Clipper indicate that they intend to pay out from the joint venture account between the beginning of September and the end of 2006 (p.127) ("the September Estimate of Wind Down expenses").

14. The Payments Summary and the three estimates of wind down expenses reveal the following:

1. That Clipper appears to be using the joint venture accounts to service its new shipping line (which is operated by Clipper wholly independently of the joint venture with Global); and

2. That Clipper have paid expenses out of the joint venture account which Global dispute are for the account of the joint venture (as Clipper are well aware), and that Clipper clearly intend to continue to do so; and

3. That Clipper's estimates of wind down expenses bear little resemblance to the sums actually paid out by Clipper.

15. The immediate problem faced by Global is as follows. Global have little prospect of recovering from Clipper in respect of any wrongful and unauthorised payments which are made by Clipper out of the joint venture account. Clipper is a Liberian company. As far as Global are aware, Clipper is simply signatory to the JVA[2], and has no other assets. Even if Global procure an award in their favour against Clipper, awarding them damages for sums wrongfully paid out of the joint-venture account, this is likely to be next to worthless.

16. Against this background, Global seek relief pursuant to Article 23 of the ICC Rules, which provide as follows:

"*1. Unless the parties have otherwise agreed, as soon as the file has been transmitted to it, the Arbitral Tribunal may, at the request of a party, order an interim or conservatory measure it deems appropriate. The Arbitral Tribunal may make the granting of any such measure subject to*

---

[2] The day to day running of the Joint Venture has always been done by other Clipper group companies.

45.     Global's complaint is that on its assessment the balance in fact due to NDS is US$221,605. The difference between the two figures (of US$63,500) relates to a payment by Clipper for the carriage of empty containers (94x20' and 38x40') to South Africa, which was not part of the JV (which did not operate to South Africa) (p.140). The containers were shipped for Clipper's account.

46.     Accordingly, Global seek an interim order that no sum above US$221,605 be paid to NDS from the JV account.

**(5)     TAM balance**

47.     TAM are "Tropical Agencia Maritimas", who were the JV's agents in Brazil. The Payments Summary reveals that a payment of US$83,848.23 appears to have been made from the JV account to TAM on 7th September 2006, in respect of the period from 1st September 2006 (153-4). On Global's understanding, TAM have not performed any services for the JV during this period, and indeed have not done so for some time. The last vessels which operated under the JV left Brazil on 1st July 2006 (ARETI V0623) and on 2nd July 2006 (ANAIS V0625). Global understands, however, that TAM are now acting for Clipper in their new service. It seems likely, therefore, that this payment was for the account of Clipper's new service.

48.     Furthermore, Clipper's September Estimate of Wind-Down expenses includes a debit of US$102,000 for "TAM balance" (p.127). Once again, Global contend that this payment is likely to be for the account of Clipper's new service, given that TAM's activities for the JV ceased so long ago. Global have asked for confirmation that these sums are properly for the account of the JV (p.135), but no response has been forthcoming.

49.     Against this background, Global seek an order preventing Clipper from paying any further sums to TAM out of the joint venture accounts.

13

*appropriate security being furnished by the requesting party. Any such measure shall take the form of an order, giving reasons, or of an Award, as the Arbitral Tribunal considers appropriate".*

17. In summary, Global seek the following interim relief (a draft order is at Schedule 3 attached hereto):

　　1. An order preventing Clipper from using the joint venture account for any business other than that arising out of the joint venture, and preventing Clipper from mixing joint venture funds with any other funds; and

　　2. An order preventing Clipper from henceforth paying sums which are in dispute out of the joint venture account, including those sums identified in Schedule 1 attached; and

　　3. An order preventing Clipper from paying any sum over US$10,000 out of the joint venture account to any one party (other than those expenses identified in Clippers' September Estimate of Wind-Down expenses and which are not in dispute as per Schedule 1), without the prior agreement in writing of Global.

18. Global invite the tribunal to rule that the above orders should be in force until further order. Clipper may, of course, apply to the Tribunal at any time in order to vary the order, and undisputed additional payments will no doubt be made with the agreement of Global. For the avoidance of doubt, if required by the Tribunal Global are prepared and able to provide a cross-undertaking in damages to the value of US$20,000 (by way of an L/C).

19. Global would also suggest that the parties agree that pending the substantive arbitration itself, any interim applications be heard by the chairman of the Tribunal (as distinct from all three members), to keep down costs and avoid difficulties in fixing hearings. This would include the remaining interim applications which have not yet been issued. Global await Clipper's response to this suggestion.

6

**III.    An order preventing Clipper from using the joint venture account for any business other than that arising out of the joint venture, and preventing Clipper from mixing joint venture funds with any other funds**

20.    This is apparent from the Payments Summary (p.145). For example, there were payments into the account on 22nd and 23rd August 2006 which relate to voyages which post-date the termination of the JV. As explained below, Global are concerned that Clipper are also using the account to pay for expenses on its new service, in particular for payments to Senamar and TAM. Global are also concerned at the use of the words "check for customer" in order to describe a payment (e.g. p.154). Such wording does not reveal the identity of the payee.

21.    Clearly the joint venture account should not be used for any business other than the joint venture, hence Global seek the interim relief as identified above.

**IV.    An order preventing Clipper from henceforth paying sums which are in dispute out of the joint venture account, as identified in Schedule 1**

22.    Clipper have been aware that various payments are disputed by Global for many months. Global have recently asked for confirmation on several occasions that such payments will not be made without the prior agreement of Global (see p.117, 128, 134).

23.    In response to Global's queries, Clipper have responded that *"they do not intend to make any actual payment to Senamar in the near future, at least not until they have received from the local agent an account of the pending disbursements"* (p.132-3)[3]. These responses are at best equivocal, and in any event no general confirmation has been forthcoming that they will not pay out sums which are in dispute.

---

[3] The payments to Senamar remain in dispute – see below.

24.   Indeed the Payments Summary reveals that Clipper has paid out sums in the knowledge that they are disputed by Global, as is made apparent below.

25.   Against this background, Global seek an order preventing payment of the sums identified in the draft order attached at Schedule 3 (as identified from Clipper's September Estimate of Wind-Down expenses (p.127)[4]). Each of the sums which are in dispute is considered below.

## (1)   Payments arising out of sub-poena from SEC

26.   On 13th April 2006, Clipper Americas Inc was served with a sub-poena by the SEC (p.11). It is understood that this relates to alleged corrupt payments and bribes made by Daimler/Chrysler to officials.

27.   Since then, in their August Estimate of Wind Down expenses, Clipper estimated the costs of complying with the sub-poena as in the region of US$500,000. In their September Estimate of Wind Down expenses, Clipper estimated the further costs of complying with the sub-poena would be in the region of another US$233,800. Despite requests for confirmation that no further sums will be paid out of the JV account, none has been forthcoming (p.134).

28.   At the date of writing, on Global's understanding, at least US$46,835.65[5] (paid on 29th August 2006) has already been paid by Clipper to its lawyers Fulbright & Jaworski LLP ("F&J"), out of the JV account. This sum was paid by Clipper in the knowledge that payment was disputed by Global. The letter sent to Clipper Americas Inc by F&J on April 20 2006 requested a deposit of US$30,000 before commencing work. Clipper indicated on 9 June 2006 that F&J had rendered an invoice for US$51,655.68 for work done in April 2006 and that the total amount already incurred for work done by F&J to 31 May 2006 was US$136,000. Global

---

[4] Global have assumed that these sums have not yet been paid, albeit this is not entirely clear from the Payments Summary (see below).
[5] Additional payments may have been made before 1st May 2006.

is concerned that these payment may also already have been made (p.155). Clipper were made aware that such payments were disputed from as early as 24th April 2006 (p.27).

29.     As Global have made clear to Clipper, Global do not accept that the sub-poena, served on Clipper Americas Inc, has anything to do with the joint venture. The relevant correspondence is at p.25ff. Thus far, Clipper has explained that *"the joint venture .. has effect wire transfers from the Joint Ventures Bank Account in Houston referring to overfreight payments to an official account in Stuttgart, Germany. The beneficiary of the overfreight in ANAMMCO, which is an official company belonging to the Mercedes Benz Group* [a predecessor to Daimler/Chrysler]" (p.25-26).    Global expressed surprise that there were payments by the JV to Anammco (p.34), having had no knowledge of such payments.

30.     Global have pressed for documents which would demonstrate that the alleged legal expenses did arise out of the operation of the JVA, but no satisfactory response has been forthcoming (p.55, 63, 66). The correspondence rests with a request from Global dated 14th June 2006 for a copy of Clipper's instructions to F&J, the advices of F&J, and invoices of F&J (with a breakdown of time) (p.78). None of these documents have been provided. Nor have any documents been provided which demonstrate that any sums were paid by the JV account to Anammco.

31.     In view of the sum paid to date to Clipper's lawyers, and the failure to provide any satisfactory evidence that the sub-poena has anything to do with the JV, Global seek an order that no further sums be paid (to any third party, including F&J) in respect of this sub-poena.

**(2)    Wind-down expenses**

9

32.     In their Estimate of Wind Down expenses dated 11th May 2006 (p.44ff), Clipper allowed themselves the sum of US$400,000 in respect of their own overheads in winding down the joint venture following termination on 10th July 2006.

33.     Global considered this to be excessive, and indicated that they would accept responsibility for the administration of the wind-down, with an estimated cost of US$180,000 (p.55). This proposal should be considered alongside the terms of the JVA, which provided that: "*the partners agree that the service should always maintain the overhead expenses at the lowest possible level, cost/benefit being the determining factor*" (clause 4). For the avoidance of doubt, this was the sum proposed by Global to complete the administration of the wind-down.

34.     Clipper refused the proposal that Global take over administration of the wind-down, on the basis that "*a number of Global's employees previously allocated to assist the Joint Venture Service have been replaced and/or their employment has been terminated*" (p.61, 63). Global made it clear that they had the resources to handle the process (p.67), and asked again why Clipper insisted on handling the process at such an excessive cost[6]. Global repeated their request on 14th June 2006 (p.79). No response has been forthcoming.

35.     At the time of writing, Clipper have paid themselves at least US$60,000 from the JV account in respect of July management fees (paid on 19th July)[7]. Given that Clipper were aware that Global had offered to complete the entire process for US$180,000, this sum in respect of one month appears excessive.

36.     In Clipper's Answer, provided to Global on 11th September 2006, Clipper have now indicated that they "*will manage the wind down within a budget of*

---

[6] Furthermore, on my understanding, the estimates were given by Clipper on the assumption that they were carrying out the expensive process of splitting containers between the parties. In fact this is being carried out by Global, and so the sum of US$400,000 as proposed by Clipper looks all the more unrealistic.
[7] Global would add that the relevant entry in the Payments' Summary is for US$76,670.41, which is for July management fees "+ interco bal", and it is not known what this Interco balance comprises. Global suspect, however, that the management fee was US$60,000, in accordance with Clipper's estimate in the May Estimate of Wind Down expenses.

*US$180,000*"[8].    In their August and September Estimates of Wind Down expenses (p.100, 127), however, Clipper have included the sum of US$180,000 for their wind down expenses for the period January 2007 to the end.  Given that they have already paid themselves at least US$60,000, the payment of an additional US$180,000 will clearly result in them exceeding even their self-imposed budget of US$180,000.

37.    In view of the substantial sum paid to date, the failure to provide any explanation for the high level of overheads proposed by Clipper, and Clipper's own apparent self-imposed budgetary constraint, Global seek an interim order that no further sums be paid by the JV to Clipper in respect of its overheads in winding down the JV.

## (3)    Payments to Senamar

38.    Senamar were the agents of the JV in Angola.  They are now Clipper's agents for their new service (p.138-139).

39.    On Global's understanding, Senamar rendered services to the JV in relation to ANAIS V0625.  The final voyage report indicates that Senamar were due the sum of US$94,412.81[9] in respect of this voyage (p.125).

40.    However, the Payments Summary reveals that the sum of US$125,000 has already been credited (payment made on 20th July 2006) to Senamar in respect of this voyage (p.151-2)[10].  And it also reveals that a further sum of US$300,000 was paid "on account" to Senamar on 24th August 2006 (p.153-4).  Global do not

---

[8] Global have queried precisely what Clipper mean by this sentence (p.135).  And despite requests for confirmation that no further sums will be paid out of the JV account for this expense, none has been forthcoming (p.134).

[9] Lobito and Luanda are the ports in Angola.  The voyage result has been taken from Clipper's accounting system.

[10] Hence the JV account should in fact be credited with the sum of U$30.587.19 from Senamar.

know what this payment was intended to cover, or whether it has anything to do with the JV.

41.    Meanwhile, the September Estimate of Wind-Down expenses provides for a credit to Senamar of a *further* US$247,100 (p.127). Global cannot understand how such vast sums (totalling US$672,100) can possibly be due to Senamar in relation to the JV. It seems much more likely that these sums are due to Senamar for services rendered to Clipper's new service.

42.    Global have asked Clipper for an explanation of payments to Senamar (p.119, 128, 134), but no satisfactory explanation has been forthcoming. As stated above, Clipper have stated that "*they do not intend to make any actual payment to Senamar in the near future, at least not until they have received from the local agent an account of the pending disbursements*" (p.133). Clipper added that the balance owed to Senamar was in the region of US$500,000, hence they made a payment of account of US$300,000, but provided no confirmation that the balance owed to Senamar was due in relation to the JV. Clipper's response provides very little comfort to Global.

43.    In the circumstances, Global seeks an interim order that no further sums be paid to Senamar from the joint venture accounts.

**(4)    Payment to NDS**

44.    The September Estimate of Wind-Down expenses provides for a payment of US$285,105.00 to NDS. On Global's understanding, this sum has not yet been paid, although the estimate contemplates payment in the first week of September 2006 (p.127). Global have queried this payment on 5th September 2006 and subsequently, but no response has been forthcoming (p.118, 135).

**V.      An order preventing Clipper from paying any sum over US$10,000 out of the joint venture account**

50.    Global seek an order preventing Clipper from paying any sum over US$10,000 out of the joint venture account to any third party or to Clipper itself (other than those expenses identified in Clipper's September Estimate of Wind-Down expenses and which are not in dispute as per Schedule 1), without the prior agreement in writing of Global.

51.    Global seek this order to prevent Clipper paying further unjustified sums out of the JV account. As explained above, Global have been content to pay sums out of the JV account in the knowledge that they are in dispute (e.g. regarding the SEC sub-poena). Further, Clipper's estimates of wind-down expenses often bear little resemblance to the sums in fact paid out. Further, despite requests, Clipper have not confirmed that they will not pay disputed sums out of the JV account. Hence the only way to protect Global's position is to make an order in these terms.

**VI.      Other breaches by Clipper**

52.    Interim relief of the kind sought by Global may be granted in the discretion of the Tribunal. It may be relevant to the exercise of that discretion to summarise the other claims which Global will be bringing against Clipper.

53.    For the avoidance of doubt, these are claims for damages based on previous breaches of the JVA (as distinct from anticipated breaches which are the subject of the application for interim relief above). Although this is not the place to go into the merits of these claims in detail, it may be helpful to summarise the claims and the quantum of damages sought by Global. The claims are summarised in Schedule 2 attached hereto.

14

54.  I summarise below the approximate current quantum of Global's claims for damages (in US$):

| | |
|---|---|
| 1. Exposure to Brazilian tax authorities | Not yet quantified |
| 2. Diversion – lost revenues at Santos | 120,000 |
| 3. Diversion – misplacement of empty containers | 84,000 |
| 4. Cargo taken by Clipper's new service | 40,000 |
| 5. Bunkers on ARETI and ANAIS appropriated by Clipper | 553,643 |
| 6. Bunkers misappropriated on Clipper Ipanema and Itajal | 178,000 |
| 7. Unjustified payments regarding SEC | 60,000 (min) |
| 8. Excessive overheads for wind down | Not yet quantified |
| 9. Unjustified payments to Senamar | Not yet quantified |
| 10. Unjustified payments to TAM | Not yet quantified |
| 11. CEC Copenhagen | Not yet quantified |
| 12. Anais extension cost | Not yet quantified |
| 13. Anais off hire on voyage 617 | 52,215.50 |
| | |
| **Total** | **(min) U$1,209,557.20** |

55.  Without going into the merits of these claims in any detail, it can be seen that Global have very substantial claims in damages against Clipper.

## VII.  Retention of freight by Global

56.  Finally, and once again because it might be said to be relevant to the exercise of discretion, I seek to explain below the basis for Global's retention of freight.

57.  This evidence will also be relevant, of course, to the application for payment of this sum which Clipper have indicated that they intend to bring (albeit at the time of writing no application has been made).

58.  Global contend that:

1. Realistically, the sum retained by Global of US$679,054.89, at the very least, is likely to be due to Global upon completion of the wind-down process; and/or

15

2.  In any event, Global are entitled to set off this sum against Global's significant claims for damages; and/or

3.  In any event, Global's retention of this sum should not prevent the Tribunal making the order requested herein by Global.

59.  As to (1), it is apparent from Clipper's latest September Estimate of Wind-Down expenses that Clipper project an end balance loss of US$484,092.62.

60.  Global contend that realistically, however, the following debits should be deleted from Clipper's forecast:

1.  US$244,800 in respect of the SEC sub-poena. Given that Clipper have provided no evidence that the sub-poena had anything to do with the JV, and given that a substantial sum has already been paid from the JV account for these legal fees, Global contend that the likelihood of any further sums being due is remote.

2.  US$247,100 to Senamar. Given that US$425,000 has already been paid to Senamar, it is inherently unlikely that any further sum is due (see above) (indeed it may be that sums are owing to the JV account).

3.  US$102,000 to TAM. Given that TAM's involvement for the JV ended so long ago, it seems very unlikely that this sum is for the account of the JV.

4.  US$60,000 for Clipper's overheads from January 2007 to the completion of wind-down. Given that Clipper have already paid themselves US$60,000 by way of overheads, and on their own case appear to concede that these overheads should be limited to US$180,000. It seems very unlikely that any further sums above US$120,000 will be payable by way of overheads to Clipper.

61.  Further, the following credits should be added to the estimate:

1.  Credit should be given for the freight retained by Global. At the time of writing this amounts to US$679,045.89.

2. Credit should be given for likely receipts of container demurrage. I am told that in 2006, the JV has received an average per month between January and August of US$70,000 (a total of approximately US$560,000), and at present there is additional demurrage due and owing of about US$1.3m. In addition, in 2005 the JV received a total of US$1.4m, and at present there is additional demurrage due and owing from 2005 of US$1,890,000. A conservative estimate is that the JV will have received US$70,000 per month for the rest of the year, plus 30% of the sum outstanding for 2005 and 2006 = US$280,000 plus US$957,000 = US$1,237,000.

3. Credit should be given for the value of bunkers belonging to the JV which were appropriated by Clipper upon termination of voyages on the ARETI and ANAIS (see below). No response has been made by Clipper to Global's allegations in this regard. This credit is for a total of US$553,643.00.

62.     Adjusting Clipper's figure of a deficit of US$484,092.62 accordingly, there will be a surplus of at least US$2,639,496.20 (US$3,123,588.80 less US$484,092.62).

63.     For the avoidance of doubt, the sum retained by Global was originally higher than US$679,045.89. However, as explained in Schedule 2, on 31st August 2006 Global were forced to pay the sum of US$243,397.41 to Oceanus. Further, the minor sum of US$3,000 per month has been paid out to Global to compensate them for the costs of managing the division of containers during wind down[11].

64.     As to (2), the fact remains that Global also have very substantial claims for damages (see above). Given that these claims all arise out of the operation of the JV, Global contend that they are entitled to set-off these claims against any sums due to Clipper. This provides an additional justification for Global's retention of the sum of US$679,045.89.

---

[11] These payments are disputed by Clipper.

17

65.    As to (3), there is no evidence to suggest that Global will dissipate the sum of US$679,045.89.  By way of comparison, there is evidence that Clipper are likely to make payments out of the JV account which they know are disputed by Global – see above.

## VIII.  Conclusions

66.    Global seek an order in the terms of the draft attached in Schedule 3.

67.    Such an order is necessary in order to protect Global from further unjustified payments being made out of the joint venture account.  In this regard, Clipper have demonstrated that they are content to make payments despite the fact that they know that such payments are in dispute.

68.    For the avoidance of doubt, Global reserve the right to apply for further interim relief.

_Rebecca King_

Signed

Dated 19 September 2006

18

### Schedule 1

### Payments from Clipper's September Estimate of Wind-Down expenses which are in dispute

| | Item | Sum debited |
|---|---|---|
| 1 | Legal fees – SEC – 6 x instalments of US$40,800 | US$244,800.00 |
| 2 | Balance due NDS – any sum above US$221,605 | US$63,500.00 |
| 3 | TAM balance | US$102,000.00 |
| 4 | Balance to Senamar | US$247,100.00 |
| 6 | CSL overhead Jan 07 to end | US$120,000.00 |
| | **Total** | **US$777,400.00** |

## Schedule 2

### (1)    Diversion of freights

1.    The JVA provided that although the tonnage was operated by Clipper, Global had the right to issue their own bills of lading for up to 50% of the cargo carried eastbound (clause 5). Clause 5 further provided as follows:

"*GLOBAL are to collect and account for freight on a vessel by vessel basis. GLOBAL will retain 2% commission on the freight and transfer the balance to the Service account with CAI, Houston or Nigeria America Line's account with Royal Bank of Scotland in London. ... Furthermore, should GLOBAL at any time, for any reason, be prevented from transferring surplus freight to the Service account ... , then no further Global bills of lading to be issued until situation has been rectified. The Service will deduct any outstanding freights, from GLOBAL'S profit share in the service.*

*GLOBAL will pay interest to the service at the rate of 10% p.a., on any funds not timely transferred to the Service account.*

...

*The issuance of GLOBAL bills if lading will be discontinued, in case GLOBAL is unable to comply with this clause provision for the timely transfer of surplus freight*".

2.    In accordance with clause 5 of the JV, when Global issued its own bills of lading (as it was entitled to do), then freight was collected by Global, and then remitted by Global to the "Service accounts" (net of 2% which was retained by the Global as a credit towards Global's overheads). These were accounts operated by Clipper in Houston and London. Clipper paid various expenses from these accounts (overheads etc), and in practice Clipper was sole signatory on these accounts.

3.    Freight was remitted by Global to the Service accounts pursuant to space charter agreements which were concluded between Global and Clipper.

4.    Things progressed relatively smoothly until January 2005. At this point Global contend that Clipper took a unilateral decision to divert freight due on Global's bills from the clients directly to the service accounts, by-passing Global's account in Brazil. This conduct has had very serious ramifications.

5.    Global contend that there was no justification for the Defendant's unilateral decision to divert freights straight into the service accounts. Global contend that Clipper were in breach of clauses 5 and 7(A) of the JVA, and in breach of the Defendant's fiduciary duties and duty to co-operate. In paragraph 8 of their Answer, Clipper contend, *inter alia*, that "*whilst [Clipper] did offer customers the opportunity of remitting the relevant freight direct to the Houston service account at the beginning of April 2005, they did not instruct them to do so*". Global contend that "offering customers the opportunity" to do so was itself a breach of the JVA. Clipper has also sought to justify its action on the grounds, *inter alia*, that Global had been late in remitting freight to the service accounts under space charter agreements. This is disputed by Global.

6.    The payment of freights direct to the service accounts has resulted in the Claimant being exposed to very serious penalties from the Brazilian fiscal authorities.

7.    It is possible that if Global can produce to the Brazilian authorities a letter from Clipper, which makes it clear that the freights received directly into the service accounts were received on behalf of Global, then Global's liabilities to the Brazilian authorities may be reduced. At a meeting on 5th April 2006, Clipper eventually agreed to provide such a letter (as Clipper concede in paragraph 11(c) of their Answer). But no explanation is given in the Answer as to why a letter has not yet been provided (despite agreeing to do so over 5 months ago).

21

**(2)     The final voyages on ARETI and ANAIS**

*(a)     Misappropriation of JV business*

8.     Global contend that Clipper has encouraged JV customers to pull out of their
booking on the JV's last voyage, and to use instead Clipper's new service (para
8.3 of Amended Request).   Clipper deny the allegation (para 17 of the Answer).
Further, Global contend that Clipper unjustifiably diverted the ANAIS (which
was the JV's last voyage) from Rio to Santos, such that the vessel called at Santos
4 days earlier than it should have done.  Global contends that this diversion cost
the JV in the region of US$120,000 in lost revenues from Santos (para 8.3.1 of
Amended Request).

9.     Clipper contend that the diversion was justified and in the best interest of the JV
(para 18 of Answer).  Global deny that the diversion was justified, and in any
event will rely on clauses 7 and 7(A) of the JVA, which provide that the board
(consisting of representatives from Global and Clipper) must approve "*any major
decisions affecting the service*", and that agreement in writing must be obtained
from both parties in order to "*establish or alter commercial and freight policy*".
Clipper also deny that the diversion caused Global any loss or damage (Answer,
para 18(c)).  Global disagree.

10.    Global also contend that Clipper unloaded empty containers at Santos which were
scheduled for use at Rio, with the result that Global was forced to incur costs of
US$44,000 in transporting empty containers to Rio, and US$40,000 in hiring
containers for Global's new service from Rio (para 8.3.2 of Amended Request).
Clipper deny the allegations (para 19 of Answer).

11.    In addition, Global contend that Clipper sent its own vessels (on its own account)
to call at ports which the ANAIS and ARETI were due to call at under the JV.
Global contend that this resulted in a loss of cargo and revenue of at least

22

US$40,000 for the JV (para 8.3.3 of Amended Request).    Clipper contend, *inter alia*, that their vessels called at the same ports as the JV vessels because the JV vessels were delayed, and deny that Global suffered any loss and damage (para 20 of Answer).

*(b)    Bunkers appropriated by Clipper*

12.    Voyage 2006/23 ("623") was on the ARETI, from the ports of Santos (18.06.06 to 24.06.06) and Itajai (25.06.06 to 01.07.06).    Voyage 2006/25 ("625") was on the ANAIS, from the ports of Santos (22.06.06 to 24.06.06), Rio (25.06.06 to 29.06.06) and Itajai (01.07.06 to 02.07.06).

13.    At the termination of voyage 623, the ARETI had on board 471.7 mt IFO and 57 mt MGO (p.141).    These bunkers were worth in the region of US$216,570.    At the termination of JV voyage 625, the vessel ANAIS had on board 766 mt IFO and 89 mt MGO.    These bunkers are worth in the region of US$337,073.    Global contend that these sums should be credited to the JV.    At the time of Amended Request for Arbitration, Global were not aware of the existence of this claim, and so it is not pleaded in that Request.    Global will amend the Request to include this claim, however, as soon as is practicable.    For the avoidance of doubt, Global explained this claim to Clipper by letter dated 5th September 2006 (p.117, 135), but at the time of writing no response has been forthcoming from Clipper.

**(3)    Bunkers misappropriated on Clipper Ipanema and Clipper Itajai**

14.    Further, shortly before redelivery of the Clipper "Ipanema" and Clipper "Itajai" from the JV to Clipper (on 08/02/06 and 16/06/05 respectively), Global contend that Clipper supplied excessive bunkers to these vessels, in the knowledge that they would be purchased by the JV at full price, but that under the terms of the charterparties they would be credited to the JV on redelivery at a substantially lower price than that paid by the JV.    Global contend that this resulted in a benefit

23

to Clipper at the cost of the JV. Global estimates the cost to the JV to be in the region of US$356,000, and so has a claim for damages of US$178,000 (US$356,000/2) (see para 8.12(b) of Amended Request).

15.  Clipper contend that the vessels were redelivered to Clipper with the bunker quantities on board which were required under the relevant charterparties, and that Clipper paid for the bunkers ROB in accordance with the terms of the charterparties (para 30(c) of Amended Request).

### (4)  Payments which were not properly for the account of the JV

16.  Payments have been made to SEC which Global contend were not properly for the account of the JV. Furthermore, it is not clear how much Clipper have paid to themselves by way of overheads, but it appears to be at least US$60,000. In addition, Clipper may have paid sums unjustifiably in respect of its new service (for example to Senamar), as discussed above. Global's requests to Clipper to explain the position have gone unanswered (see p.134).

### (5)  Anais c/p

17.  In order to operate the JV, various vessels were chartered by Clipper on behalf of the Joint Venture. On 15 March 2005, Clipper chartered the "Anais" for *"minimum 10 months"* on behalf of the JV.

18.  Clause 7(B) of the JVA expressly provided that pre-approval in writing must be obtained from both parties in order to *"charter any vessels on long term basis on behalf of the service"*. Global contend that in breach of the JVA, on 19 January 2006 (after Clipper had given notice of termination) Clipper extended the charterparty of the "Anais" to beyond the termination date of the JV, without seeking the agreement of Global. Global also contend that Clipper was further entitled under the Charterparty to cancel the charter as a result of the "Anais"

24

being off hire for more than 20 days without breaching the charter but failed to do so.

19.    Clipper have claimed from the JV a sum representing the difference between: (1) the hire for *The Anais* as per the charterparty and (2) the alleged relevant market hire rate, for the remainder of the charterparty term after the termination of the JV. Global deny that these sums were due. In so far as Clipper have paid themselves from the JV account any sum in respect of this claim, Global will seek repayment of the same into the JV account.

20.    In response, Clipper contend, *inter alia*, that the charterparty was extended for good reason, and that there was no need for Clipper to seek Global's consent to the extension. Further Clipper deny that it was practical to cancel the charterparty on the grounds of off-hire (see para 22 of Answer).

21.    Finally, and in relation to voyage 617 on the ANAIS, Clipper have credited the JV with the sum of US$122,800 in respect of off-hire deductions (credited to the JV account on 21st August 2006), whereas the JV should have been credited with the larger sum of US$227,231. Global claim damages for 50% of the difference of US$104,343 = US$52,215.50. This is another claim of which Global were unaware at the time of the Amended Request, and Global will amend the Request to include this claim as soon as is practicable. For the avoidance of doubt, Global explained the claim to Clipper by letter dated 5th September 2006 (p.118), but at the time of writing no response has been forthcoming from Clipper.

22.    Global would add that this is not an exhaustive list of all the claims which Global may be bringing, but serves at least to give the Tribunal a flavour of the nature of the claims which will be pursued.

## Schedule 3 – draft order

**IN THE MATTER OF THE ARBITRATION ACT 1996**
**AND**
**IN THE MATTER OF AN ARBITRATION**
**B E T W E E N:-**

### GLOBAL TRANSPORTE OCEANICO S.A.

(Claimants)

-and-

### CLIPPER SHIPPING LINES

(Respondents)

---

### DRAFT INTERIM ORDER

---

Upon reading the witness statement of Rebecca King dated 19 September 2006 and served on behalf of the Claimants, we hereby order:

1.  The Respondents, whether by themselves, their servants or agents or otherwise, be restrained until further order from:

    a.  using any joint venture account for any business other than that arising out of the joint venture with the Claimants, and/or mixing joint venture funds with any other funds; and

    b.  henceforth paying sums which are in dispute out of any joint venture account, including

        i.  any further payments of legal expenses in respect of the SEC sub-poena; and

        ii. any further payments in respect of the Respondents' overheads in winding down the joint venture; and

        iii. any further payments to Senamar; and

        iv. any sum above US$221,605 to NDS; and

        v.  any further payments to TAM; and

    c.  paying any sum over US$10,000 out of any joint venture account to any one party (other than those expenses identified in the Respondents' "September Estimate of Wind-Down expenses" and which are not in dispute), without the prior agreement in writing of the Claimants.

2.  Liberty to apply.

3.  The costs of this application be paid by the Respondents in any event.

Dated: